## W. O. BROWN v. THE STATE.

No. 3760.   Decided June 27, 1908.

**1.—Murder—Jury and Jury Law—Jury Wheel—Constitutional Law.**

The Act of the Thirtieth Legislature, page 269, with reference to the summoning and impanelling of grand and petit juries, applying only to counties having cities aggregating twenty thousand in population according to the census of 1900, is not violative of section 56, article 3, of the Constitution of Texas which inhibits the enactment of any local or special law touching the summoning or impanneling of grand or petit jurors.   Davidson, Presiding Judge, dissenting.

**2.—Same—Bill of Rights—Equality and Uniformity.**

The Act of the Thirtieth Legislature, page 269, with reference to jury service is not violative of section 1, article 14 of the Bill of Rights which requires that all laws must be equal and uniform, the same being so upon the same class.

Following Clark v. Finley, 93 Texas, 171; Gillaspie v. State, 42 Texas Crim. Rep., 351.

**3.—Same—Repeal of Law.**

The Act of the Thirtieth Legislature, page 269, with reference to jury service does not repeal the old jury law, except as to counties affected thereby.

**4.—Same—Due Process of Law.**

The Act of the Thirtieth Legislature, page 269, with reference to jury service is not violative of section 19 of the Bill of Rights, and provides due process of law of the law of the land.

**5.—Same—Legislative Power—Classification.**

The matter of designating classes for legislation is a duty devolving upon the legislative power and not upon the court, and such classification must necessarily be by population or by taxable values.

**6.—Same—Manslaughter—Charge of Court—Adequate Cause.**

Upon trial for murder where there was evidence that the deceased provoked the difficulty, a charge of the court which simply stated the adequate cause mentioned in the statute, instead of applying the law to the facts of the case, same was reversible error. Brooks, Judge, dissenting.

**7.—Same—Self-Defense—Manslaughter—Act of Third Party.**

While it is sometimes difficult to draw the line, where the question of serious bodily injury is involved, between self-defense and manslaughter, the court should nevertheless definitely instruct the jury, so that they will understand where one ends and the other begins; and where the evidence tended to show that the deceased alone provoked the difficulty with a view of inflicting severe chastisement upon defendant, the latter would have the legal right to have this, phase of the law submitted in a charge upon manslaughter. And so if the defendant believed that the deceased was bringing on the difficulty to be joined by another, this question should have been submitted.

**8.—Same—Charge of Court—Acts of Third Parties.**

Where upon trial for murder the evidence showed that the deceased and another on one side, and the defendant on the other side were engaged in an altercation, and the transaction between deceased's companion and the defendant seemed to permeate the entire difficulty, it was error to charge the jury that this could not be considered in passing upon the question whether defendant was the aggressor in the subsequent transaction with deceased which resulted in the latter's death.

**9.—Same—Evidence—Dying Declarations.**

Where upon trial for murder testimony as to certain dying declarations of deceased was admissible, the court should nevertheless have charged the jury that said declarations must be voluntarily uttered, and that deceased at the time was rational and conscious of impending death.

**10.—Same—Evidence—Prior Difficulty—Third Party.**

Where upon trial for murder defendant as a witness had gone no further in his testimony than to assert as a fact some prior difficulty with deceased's companion, to show that the latter two were acting together to do him harm, it was reversible error to permit the State upon cross-examination to go into details of said prior difficulty, and then introduce other State witnesses to contradict defendant's testimony thereon.

**11.—Same—Special Venire—Sheriff's Return.**

Where upon trial for murder it appeared that for all jurors whom the sheriff's return showed were summoned either in person or by leaving summons at residence, and for those who were not present an attachment was issued and all were brought into court and for good cause shown excused, there was no merit in the complaint that the court erred in failing to quash the sheriff's return.

**12.—Same—Misconduct of Jury—Ignoring Charge of Court.**

Upon trial for murder after conviction, on motion for new trial, jurors could not be permitted to show by their affidavit that they ignored defendant's special

charges submitted to them by the court. Following Dancy v. State, 41 Texas Crim. Rep., 293.

### 13.—Same—Testimony Outside of the Record.

Where on motion for new trial upon conviction for murder, nine of the jurors swore that they did not receive testimony in the jury room that defendant had killed other men, and three of the jurors swore that they did receive this testimony, it became an issue of fact for the trial court, and there was no reversible error in not granting a new trial.

### 14.—Same—Charge of Court—Deadly Weapon.

Where upon trial for murder the weapon used by the defendant was shown to have been a pistol, and there was no dispute that deceased was shot by defendant with said pistol and killed, there was no error in not instructing the jury on the instrument or means used with reference to showing intent.

### 15.—Same—Argument of Counsel.

Where upon trial for murder the State's counsel made an inaccurate argument upon the evidence, it was not error to refuse a charge withdrawing same, as defendant's counsel had the right to answer this argument. Nor was it improper argument that State's counsel believed the jury would convict defendant because they were honest men; and that all parties convicted of felony were entitled to bail if the punishment did not exceed fifteen years in the penitentiary.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. W. W. Nelms.

Appeal from a conviction of murder in the second degree; penalty, thirty years imprisonment in the penitentiary.

The opinion states the case.

*Crane, Gilbert & Crane, Crawford & Lamar* and *Muse & Allen,* for appellant.—On question of jury law. Considering the Texas law attacked, from this viewpoint, the vice in the present law which makes it a special law lies in the fact that it matters not what may be the future growth of cities and towns in the respective counties in Texas, whether shown as a matter of fact or by a Federal census, the operation of the law by its terms is limited and restricted to those having the requisite population under the census of 1900.

We take it that the court in considering this law will not treat the statute as elastic, or foreshadow its amendment by the Legislature in such manner as to make its operation general, but will confine itself to the law as it is. And as it is, for all time, it limits the operation of the law to those counties having the requisite population under the census of 1900. State v. Scott (Neb.), 100 N. W. Rep., 812; State v. Ames, 91 Minn., 365; Sutton v. State, 33 L. R. A., 589, and cases and authorities cited in the opinion.

On question of sheriff's return on special venire: Clay v. State, 40 Texas Crim. Rep., 593; 601–3; Bates v. State, 19 Texas, 123; Speer v. State, 2 Texas Crim. App., 246; Osborne v. State, 23 Texas Crim. App., 431; Thuston v. State, 18 Texas Crim. App., 26; Drake v. State, 5 Texas Crim. App., 649; Kellum v. State, 33 Texas Crim. Rep., 82; Swofford v. State, 3 Texas Crim. App., 76; Thompson v. State, 19 Texas Crim. App., 593; Neyland v. State, 13 Texas Crim. App., 536;

Charles v. State, 13 Texas Crim. App., 658; Rodriquez v. State, 23 Texas Crim. App., 503.

On question of misconduct of jury: Kannemacher v. State, 51 Texas Crim. Rep., 118; 101 S. W. Rep., 238; Blocker v. State, 61 S. W. Rep., 391; Riley v. State, 81 S. W. Rep., 711; Lankster v. State, 42 Texas Crim. Rep., 360; 65 S. W. Rep., 373; Barnes v. State, 43 Texas Crim. Rep., 355; 65 S. W. Rep., 922; Mitchell v. State, 33 S. W. Rep., 367; Terry v. State, 38 S. W. Rep., 986; Darter v. State, 39 Texas Crim. Rep., 40; 44 S. W. Rep., 850; Gann v. State, 42 Texas Crim. Rep., 133; 59 S. W. Rep., 897; Ysaguirre v. State, 42 Texas Crim. Rep., 253; 58 S. W. Rep., 1005; Covington v. State, 51 Texas Crim. Rep., 48; 100 S. W. Rep., 368.

On question of dying declarations: Hunnicutt v. State, 18 Texas Crim. App., 498; Ledbetter v. State, 23 Texas Crim. App., 247; Lister v. State, 1 Texas Crim. App., 739. On question of charge on dying declaration: Taylor v. State, 38 Texas Crim. Rep., 552; 43 S. W. Rep., 1019; Sparks v. State, 34 Texas Crim. Rep., 86; Nichols v. State, 32 Texas Crim. Rep., 391; Carlisle v. State, 37 Texas Crim. Rep., 108; Rains v. State, 33 Texas Crim. Rep., 294; Parish v. State, 35 Texas Crim. Rep., 82.

In the admission of extraneous crimes, the State will not be permitted, upon cross-examination of the defendant, or by other witnesses, to prove the details of such crimes, and try them against defendant: Ware v. State, 36 Texas Crim. Rep., 597; Brittain v. State, 36 Texas Crim. Rep., 406; Morrison v. State, 39 Texas Crim. Rep., 519; 44 S. W. Rep., 511; Wade v. State, 90 S. W. Rep., 503; Chumley v. State, 20 Texas Crim. App., 547; Barkman v. State, 41 Texas Crim. Rep., 105; 52 S. W. Rep., 69, 71; Woodward v. State, 51 S. W. Rep., 1122. On question of instrument or means used: Cases cited in opinion.

Adequate cause should not be restricted to the provocation arising at the time of the homicide. White's Penal Code, sec. 1182. Thomas v. State, 42 Texas Crim. Rep., 386; 56 S. W. Rep., 71; Manning v. State, 48 Texas Crim. Rep., 55; 85 S. W. Rep., 1149; Adams v. State, 42 Texas Crim. Rep., 366; 1 Texas Ct. Rep., 370; Williams v. State, 24 Texas Crim. App., 637; 7 S. W. Rep., 333; Martin v. State, 40 Texas Crim. Rep., 660.

Issue of manslaughter upon imperfect self-defense: Bornard v. State, 25 Texas Crim. App., 173; 7 S. W. Rep., 862; Folks v. State, 58 S. W. Rep., 98; Franklin v. State, 34 Texas Crim. Rep., 286; 30 S. W. Rep., 232; Franklin v. State, 30 Texas Crim. App., 628; 18 S. W. Rep., 468; Bonner v. State, 29 Texas Crim. App., 223; 15 S. W. Rep., 821; Halliburton v. State, 32 Texas Crim. Rep., 51; 22 S. W. Rep., 48; White's Penal Code, section 1183.

Issue of manslaughter, based on assault and battery by the deceased, causing pain, to be affirmatively charged as adequate cause of producing sudden passion: Ware v. State, 49 Texas Crim. Rep., 413; 92 S. W. Rep., 1093; Kannemacher v. State, 101 S. W. Rep., 242.

Should have defined assault and battery: Hardin v. State, 103 S. W. Rep., 401.

*F. J. McCord,* Assistant Attorney-General, for the State.

It seems that our law and the law here in question with reference to the selection of jurors was taken from the law of Ohio, under an act of the Legislature of 1873 of that State, which provides for the selection of jurors in counties of a certain population as determined by the last census. This law was most vigorously assailed as being unconstitutional, because it was special and local in its character and applied to but one county in the State. And this came before the Supreme Court of Ohio, and will be found reported in the Thirty-fourth Ohio, Rep., 228, in the case of McGill v. State. In that case, the Supreme Court reviewed all the authorities on the subject, and held that the act was constitutional. We invite the court's careful attention to the reasoning of the court in that case. They say in that case: "That the constitution, it will be observed, has not undertaken to declare that all laws shall have a uniform operation. Uniformity in that respect it made requisite only in case the law itself be one of a general nature. And if it do not purport to be such a one, no objection as to uniformity or want of uniformity in its operation can be interposed." They further say in that opinion, "The subject may be general, but the law and rules prescribed may be special." Wheeler v. City of Philadelphia, 77 Penn., 338; Iowa Land Co. v. Sofer, 39 Iowa, 112; Haskel v. City of Burlington, 30 Iowa, 232; C. B. & Ry. Co. v. Iowa, 94 U. S., 155.

DAVIDSON, PRESIDING JUDGE.—The writer respectfully states that he cannot agree with his brethren in holding the Act of the Thirtieth Legislature constitutional which authorizes those counties in which is included a city or cities aggregating 20,000 inhabitants to operate under a different rule with reference to the summoning and empaneling of grand and petit juries from the rule generally in vogue in the State. I have stated my reasons for dissenting at some length in the case of Bob Smith v. State, decided at the present term, and refer to that case for dissenting on that proposition. The majority of the court thinks the judgment should be reversed for reasons herein stated.

Our Brother Brooks has written an opinion, among other things, holding the charge is sufficient as given by the court in regard to the issue of manslaughter. We cannot concur in these views and believe the charges given are sufficiently erroneous in this respect to require a reversal of the judgment. A sufficient summing up of the facts as bearing upon the question of manslaughter will be found in the statement by Judge Brooks in his opinion, herewith filed and unnecessary here to recapitulate. The charges given are very general, following the statutory definition. Among other things, the court charged

that a provocation must arise at the time of the commission of the offense and must not be the result of a former provocation, and that the act must be directly caused by the passion arising out of the provocation, and that it is not enough that the mind be merely agitated by the passion arising from some other provocation, or a provocation given by some other person than the party killed; and further an assault and battery producing pain or bloodshed or any condition or circumstance, or combination of conditions or circumstances, which is capable of creating and does create sudden passion, such as anger, etc., which renders the mind incapable of cool reflection; and further, in a general way, instructs the jury that the provocation causing sudden passion must arise at the time of the killing, and it is the duty of the jury in determining the adequacy of the provocation to consider in connection therewith all the facts and circumstances in evidence, and if they should find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind, in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law. Exception was reserved to these phases of the charge and omissions. Appellant's contention is that these charges on manslaughter are not sufficient. That as given the charge relegates the adequate cause and sudden passion, first, to an assault producing pain or bloodshed, and, second, a general statement as above indicated. His further contention is that the court should have gone farther, and applied the law to the facts more particularly to the end that the jury might understand the nature of adequate cause and sudden passion arising out of the immediate facts attending the homicide and as applicable thereto. If the deceased provoked the difficulty by taking a seat upon the arm of the chair occupied by appellant and placing his arm around him under the circumstances detailed by him, then deceased was the aggressor, and produced the occasion of the difficulty, and appellant had the right to ask him to desist and upon his failure to do so to resent such insult and assault, and if Johnson then attacked him and caught him in the collar with his hand and struck him over the eye and followed this up by throwing him upon the floor and choking him, these would be additional causes of provocation, and although appellant may have gone too far in using his pistol by shooting, it would still be manslaughter, and this phase of the law should have been given under the facts of this case, and if appellant used more force than was necessary under the law of self-defense, and his mind was incapable of cool reflection, his offense might still be no higher than manslaughter. Second. Even if appellant went sufficiently far, in repelling the act of the deceased in going to the chair, to place him beyond the rule of self-defense, and drew his pistol with a view of forcing the deceased to absent himself from the chair and taking his arm from around him, appellant, and this was done not with a view of

killing but of forcing the deceased from him, and in the struggle he shot and killed, this would be manslaughter. If, however, appellant drew his pistol, conceding that he was in the wrong, and it was drawn for the purpose of taking Johnson's life, then it might be otherwise, but that is not under discussion at ·this point. And if during the struggle appellant was getting the worst of the difficulty by reason of the athletic power of his antagonist and was being choked, and he shot to save his life, or because of the severe punishment being inflicted by the deceased, this would be manslaughter. Third. If appellant believed at the time that Johnson took a seat by him that it was done for the purpose of provoking him into a difficulty to the end that he, Johnson, and Miller might inflict severe punishment on him, and that he anticipated from the beginning and during the difficulty that the conflict would be between himself and two antagonists, this would have a tendency to more strongly agitate his mind and he would have the legal right from the standpoint of manslaughter to defend against both, as much so as he would have the right to defend against the attack or anticipated attack of both if his life was in danger or his body of serious injury from the standpoint of self-defense. In other words, the right of appellant to resist the attack or anticipated attack by two antagonists, under the circumstances, would be as cogent from the theory of manslaughter as it would be from the standpoint of self-defense, provided, however, that he believed that such attack was made for the purpose of inflicting chastisements causing pain or bloodshed. The court recognized this doctrine as applicable to the law of self-defense, and so charged the jury, coupled with the further proposition that his life must be in danger or his body of serious injury in order to justify the killing. It is sometimes a little difficult to draw the line, where the question of serious bodily injury is involved, between self-defense and manslaughter, and where these propositions are in the case, the court should definitely instruct the jury so that they will understand where one ends and the other begins and be able to draw the line of demarcation from the facts. So it is clear, as we understand the facts, and the law, that if Johnson alone provoked the difficulty with a view of inflicting severe chastisement, as developed by the facts, upon appellant, he would have the legal right to have this phase of the law. submitted as bearing upon manslaughter. If appellant, under the circumstances, thought the deceased was bringing on the difficulty to be joined in by Miller, and that the difficulty was to proceed upon the theory of both of them giving him a beating, he had the right to have the law of manslaughter charged from this standpoint. Or if appellant, being in the wrong, but with no intention of killing, and was sufficiently pressed to believe that his life was in danger, and shot fatally, he still would be entitled to an application of the law of manslaughter from this standpoint. As before stated, the court recognized the doctrine of self-defense from the attack or anticipated attack of the deceased and Miller, but did not in-

struct the jury in regard to this phase of the law as applicable to manslaughter. Because of these defects or omissions in the charge, this judgment must be reversed.

There is another charge in the case that it occurs to us is erroneous, which is as follows: "The fact, if it is a fact, that the defendant Brown was in the wrong in striking Miller, as that difficulty is before you in the evidence, cannot be considered by you in passing upon whether or not the defendant was the aggressor in the subsequent transaction with the deceased Johnson resulting in the death of said Johnson." Now, it will be noticed from the facts that appellant was in the wrong in striking Miller, and that a separation occurred as well as an abandonment of the difficulty, which was followed by a hurried conversation between Miller and deceased, and followed still further by the approach of deceased on appellant with an immediate difficulty ending in death of the deceased. This transaction between Miller and appellant seems to permeate this record. It entered into the trial of the case from beginning to end, and gave it a coloring that the facts would not give forth but for the attack on Miller by appellant. If this testimony was legitimate, then what was its office or mission in the case? The State introduced evidence in regard to this difficulty. The defendant testified also about it, and appellant makes it clear that he thought and believed from what he saw occurring between Miller and deceased that Johnson was to provoke the difficulty and Miller to enter into it. We do not see how these facts can be in this record and yet not be considered by the jury in passing on the question as to whether or not the defendant was the aggressor. It was the fact that Miller and deceased had a conversation and that deceased at once approached appellant which made him believe that Johnson intended him harm, and this, under appellant's testimony, was the moving cause for his repelling the advance of the deceased, and which left the impression upon his mind that the familiarity in sitting on the arm of the chair and putting his arm around his body and "clinching" him in the peculiar manner testified by appellant was the beginning of a difficulty in which he was to engage with deceased and Miller. This charge of the court eliminates this by informing the jury that they could not consider this matter at all in passing upon the question whether or not appellant brought on the difficulty with deceased. It was a very potent fact under appellant's testimony, and tended to show that Johnson was the aggressor, and if the aggressor, then, under the circumstances, the jury ought to have considered it because it put appellant in the legal right. This practically not only withdrew from the jury the testimony and this phase of the case, but turned it cogently against the accused.

Many objections are made to the admissibility of testimony, among others, of Dayton Moses, Dr. Rimmer, as well as a statement in writing signed by the deceased, all purporting to give certain dying declarations of A. S. Johnson, touching the facts of the killing. The

record in respect to these matters is very voluminous but has been carefully considered. We think that this testimony was admissible and taken together made such a case as authorized the court to permit it to go to the jury. We do not believe, however, that the evidence is so conclusive and irrefragable as to have justified the court in refusing to instruct the jury, as requested, to the effect in substance that before they should consider such purported dying declarations of deceased they must find and believe from the evidence that when made, if indeed made by him, they were voluntarily uttered, that he was rational and that at the time he was conscious of impending death. In the case of Taylor v. State, 38 Texas Crim. Rep., 552; 43 S. W. Rep., 1019, this rule is commended by Judge Henderson in this language: "Inasmuch as some controversy was made by appellant as to whether said declarations were freely and voluntarily made, and that the deceased was of sane mind at the time, and conscious of approaching death, the court instructed them that, if said declarations were not made under the safeguards required by law, not to consider same." After quoting the charge given in that case he adds: "In our opinion, it embodies a correct rule on the subject, and was applicable to the testimony."

Again, we believe the court erred in admitting in evidence the details of the prior controversy or difficulty between appellant and one Miller. Appellant in his direct testimony given in his own behalf, stated in substance that he had a short time before this, had some controversy with Bob Miller. The mere fact of such difficulty was stated by him but none of the details of such difficulty were given, the cause thereof, or what took place between the parties. The mere fact was stated in connection with his testimony in substance to the effect that soon after this he saw Miller and deceased talking together and looking in his direction, as explanatory of his apprehension and belief that Miller and Johnson meant to do him some harm, and that Johnson's conduct in coming to him soon thereafter was in furtherance of a common design on the part of Miller and Johnson to engage him in a difficulty. In this state of the proof the prosecution was permitted, over the objection of appellant, to prove by A. B. Tabor and Bob Miller, the details of the difficulty between Miller and appellant prior to the homicide and to contradict appellant in respect to his testimony as to such details and to require him to make admissions and statements in respect thereto, the probable, if not indeed, the necessary effect of which was to embarrass and prejudice his case before the jury. Among other things, the following examination of appellant by counsel for the State was allowed over the objection of his counsel:

"Q. Isn't it a fact that a few minutes before you had the difficulty with Albert Sidney Johnson you walked up to Bob Miller and said, 'There's the God-damnedest son-of-a-bitch in Texas?' A. Not exactly that language. Q. Well, what language? A. Bob Miller had

been circulating reports that injured my business. Q. Wait a minute; please answer my question. What did you say? A. I said to him, 'You are a God-damn lying son-of-a-bitch.' Q. Didn't you stand there and curse him for several minutes? A. No, sir; I didn't. Q. Didn't you stand there with your hand on your pistol? A. No, sir; I didn't. Q. And were cursing him. Did he resent it; did he say a word; didn't he stand there while you cursed him without saying a word? A. No, sir; he went out right immediately round the end of the desk and he says, 'I will be back.' Q. Isn't it a fact that when you got through cursing him you slapped his jaws? A. I slapped him at the same time I made the remark to him. I said just what I repeated a moment ago, and he went out and said he would be back. When I slapped Mr. Miller he walked immediately over round the end of the desk and says, 'I will be back in a minute.' And Mr. Tabor took me by the arm then and turned round and says, 'Let's don't have any trouble, Brown,' and I told him I didn't want any trouble, but that man had to let me alone." When it was proposed to go into this matter and the first inquiry was made in respect thereto, appellant objected to the question and objected to any inquiry into the details of the difficulty with Miller or evidence of any of the details of his difficulty with a third party as not having any connection with the homicide on trial, except insofar as it may have affected appellant's apprehension and fear from the apprehended attack from Miller and whether appellant was right or wrong in the difficulty with Miller could not be used as a circumstance against him and the testimony was inadmissible, irrelevant and immaterial and contained and related to extraneous matters hurtful and prejudicial to him. After the cross-examination of appellant the State introduced both A. B. Tabor and Bob Miller in rebuttal, who testified at great length as to the details of said difficulty between appellant and Miller prior to the homicide, and each of said witnesses was permitted to give his version of what occurred in such controversy. We think that as presented, these objections should have been sustained. Appellant had gone no further in his testimony than to assert as a fact some prior difficulty with Miller. This was not only admissible but important as throwing light on his claim that he believed when he saw Miller and Johnson in conversation and looking in his direction that in view of such former difficulty and conference their conversation related to him. It would, of course, have been admissible for the State to have shown that in fact no such difficulty or controversy with Miller had taken place, and it might have been proper to have shown that if in fact there had been such controversy it was not of such gravity as would fairly have justified Brown in believing that the conversation between the parties named had any reference or relation to him, but it can not be claimed that the testimony elicited from appellant or produced from Miller and Tabor, stopped here. On the contrary the effect of it was probably to place appellant in a bad light before the jury and to prejudice

his case.  It is always a safe rule to limit, as far as practicable, evidence to the very matter and case in hand and to exclude admissions and testimony of extraneous offenses, contests, controversies and difficulties.  Ware v. State, 36 Texas Crim. Rep., 597; Brittain v. State, 36 Texas Crim. Rep., 406; Morrison v. State, 39 Texas Crim. Rep., 519; 44 S. W. Rep., 511; Woodward v. State, 51 S. W. Rep., 1122; Barkman v. State, 41 Texas Crim. Rep., 105; 52 S. W. Rep., 69, and Chumley v. State, 20 Texas Crim. Rep., 547.

Our Brother Brooks has written his views at length and reasons why the judgment should be affirmed.  The majority of the court are of opinion, however, that for the reasons above indicated the judgment should be reversed and it is accordingly ordered.

*Reversed and remanded.*

BROOKS, JUDGE (dissenting).—Appellant was convicted of murder in the second degree, and his punishment assessed at thirty years confinement in the penitentiary.

In an altercation occurring in the corridor of the St. George hotel in the City of Dallas a difficulty occurred between the appellant and Albert Sidney Johnson, in the course of which difficulty appellant shot deceased Johnson, from which wound, a short time after the difficulty, the deceased died.  The State's case is epitomized by the dying declaration of the deceased, which is as follows: "I live in Dallas, Texas, and work for the Southern Rock Island Plow Company. Mr. W. O. Brown, Frank Tennant, Joe Strayhorn and myself and two or three other fellows, I didn't know, went into the St. George bar and got a drink, after which, we stood around for a minute or two, and then most of us went on into the hotel proper in the corridor, and W. O. Brown sat down in an armchair about 30 feet from the Main street entrance, near the office, and I sat down on the arm of the same chair, and he told me to get up from there.  I thought he was joking, and asked him if he meant it.  He, Brown, then said, 'Yes, by God, I did, get up from there,' and hit me over the head with a pistol.  I jumped up and grabbed him, and forced him back into the chair, and he shot me in the abdomen.  I took the pistol away from him, that is, I got control of it, and the next shot went into the ceiling.  Then somebody else took the revolver away from us.  It was about seven o'clock in the evening, on Tuesday, the 22nd of January, A. D., 1907, that we went into the St. George bar, and about 30 minutes later when the shooting occurred.  I had no weapon of any kind on, nor with me, and I don't know why he shot me.  We were always good friends, and had not ever had any argument in which hot words were used."  There is some dispute in the testimony for the State and the defendant as to where the shot was fired, whether on the east or west side of the narrow entrance that leads to the corridor from the front.  Some of the testimony indicates that it was on the east side and some on the west side, but the testimony shows, we

take it, that the difficulty terminated on the west side of the narrow entrance. Appellant's testimony contains, in substance, all the defensive matter suggested by the testimony. After stating he went into the barroom hunting a couple of friends to invite to supper with him, and that they declined to go on account of previous invitation, appellant's testimony is as follows: "They told me that. they had promised to take supper with some one else, and wanted me to go with them. I told them that I could not go with them, because I had invited others to go with me. This conversation occurred as we walked out through the vestibule entrance to the lobby. So I left them and went back to the stand or desk, where I promised to meet Mr. Fred Burns. This desk stood right at the office, but just north of the office. It was a low desk, table like, and then there was a standing desk next to it, that came nearly up to the iron post. Bob Miller was just behind the standing desk, on the east side of it, and I was at the end of the desk. Mr. Tabor was in the area behind the desk with Bob Miller. There at that time I had an altercation with Bob Miller. After the altercation, however, I agreed with Mr. Tabor that I would let the matter drop, if Bob Miller would, and after that I cooled down some. After I had the altercation with Bob Miller, Mr. Tabor and I walked from the end of the desk over a few feet to a settee, and after talking a few seconds with Mr. Tabor, I sat down on the south end of that settee. I have no recollection of having seen A. S. Johnson (deceased) at any time that afternoon or evening, prior to the time that I went with Mr. Tabor and sat down on the end of the settee near the desk. I have no recollection of having seen Johnson that day, before that time. After having the altercation with Bob Miller, I walked with Mr. Tabor a few steps over and sat down on a settee on the east side of the lobby, and just as I got sat down, I glanced across the lobby, and my attention was attracted by seeing Mr. Johnson and Bob Miller in conversation, and both of them looking direct at me. That attracted my attention and I lost interest in everything else. I could not hear what they were saying, but I believed they were talking about me, because both of them were looking directly towards me. Owing to a remark that Bob Miller made to me when I had the altercation with him, I believed that he would come back and renew the difficulty. Bob Miller and Johnson only talked a very short time—probably a few seconds, and then Johnson walked directly over to me and sat down on the arm of the seat that I was on, placing his right arm around my waist. When he sat down on the arm of the seat, he placed his arm around my waist, leaning over on me somewhat, binding and holding me, and I says, 'Johnson, don't do that.' When I made that remark he clinched me a little tighter, and I began to struggle then to get loose from him. I began to struggle and raise up at the same time. He held on to me, and then says, 'What do you mean, Brown?' And I says, 'I mean just what I say.' And by that time I broke loose from him, and had gotten almost erect on my feet, and

about the time I got on my feet he struck me a blow over my left eye, and caught me by the throat, and that got me started to falling, and I never did regain my balance, and we went some distance across the lobby, toward the west side, and I fell and received a blow on the back of the head, and fell down among some chairs. Mr. Johnson continued to hold me by the throat—he was choking me, and I could not get my breath. The blow on the back of the head stunned me. I had gotten this pistol out sometime during the struggle, and after I went down and Johnson on me, and after I received the blow on the back of the head, he was still choking me, and I fired the shot or shots with a view of getting relief, and keeping him from killing me. He was choking me and I could not get my breath. I could not stand it any longer. No, I do not know from what source that blow on the back of my head was inflicted. I just know that I received a fearful blow on the back of the head. The blow was a great shock and it dazed me. I was hardly at myself for a couple of hours afterwards. I remember I fell, and I remember I got the blow on the head and went down with Johnson on top of me, and he still held me by the throat. Prior to that time I had not made any effort to shoot Johnson. And up to the time I shot Johnson, I had no purpose in my mind to take Johnson's life. I fired the pistol to save my life. I was severely hurt; the blow on the back of my head gave me an awful shock. The effects of that blow on the back of my head lasted about three weeks, and I was under the treatment of a doctor for about three days. At the time Johnson came over and sat down on the arm of the settee by me and pinioned me, I believed that he was trying to hold me and put me at a disadvantage, and that Miller was going to return, either to injure me or kill me. I fired two shots during the difficulty. I am not positive as to which shot took effect on Johnson." This, we take it, is in substance appellant's case, as far as necessary now to state same in discussing matters arising in this record.

Appellant's first complaint is that the court erred in overruling appellant's motion to quash the special venire drawn under the law enacted by the Thirtieth Legislature, chapter 131, page 269, the ground of said motion being the unconstitutionality of said law. The grounds of said motion are as follows:

"1. Said Act of the Thirtieth Legislature under which same was drawn is unconstitutional and void. The grounds of said motion in support of the unconstitutionality of said law being in substance as follows:

"2. That said Act of the Legislature was a special law, and violative of section 56, article 3 of the Constitution, which inhibits the enactment of any local or special law touching the summoning or empaneling of grand and petit jurors.

"3. That said law is unconstitutional, in that the names of jurors for jury duty are listed for a period of two years, and excludes from

jury duty all other qualified jurors who may become of age, or acquire citizenship within said two years, and thereby denies to the citizen the right to serve upon the jury, and denies to the litigant the right to select his triers from the qualified jurors of the county and further exempts from jury duty in capital cases all qualified jurors, who have served as much as four days within said two years provided by said law.

"4. That said law is further unconstitutional, in that, it is discriminatory, and made applicable only to counties having cities aggregating 20,000 in population according to the census of 1900; and thereby limits and restricts the operation of said law to counties of a class, and excludes from the operation of said law counties as a class that may hereafter or now have cities aggregating 20,000 in population.

"Said law limits its operation to said counties possessing said qualifications named, and the census of 1900 excludes all others and applies to them as a different law. * * *

"5. Said law is further unconstitutional, in that it repeals the existing jury law as to such counties having cities aggregating 20,000 population under the census of 1900, and otherwise leaves that law operative in all other counties.

"That said partial repeal is unconstitutional and void, and further, said law revives the repealed law under the contingencies provided in said act; and further, under said act delegates to the judge within said counties where said law is operative, the discriminatory power under the conditions in said law named, to suspend the Act of the Thirtieth Legislature and revive the old law as to such judge or court; and said law is violative of section 56, article 3 of the Constitution, and section 28 of the Bill of Rights.

"6. That said act is not in accordance with due process of the law of the land, and is violative of section 19 of the Bill of Rights.

"7. That said law is not equal and uniform, and is discriminatory, and is violative of the Constitution of the United States in section 1, article 14 thereof." To support appellant's contention under the above grounds, to quash the venire, he cites us to section 56, article 3 of the Constitution, which provides: "The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing 'the summoning or empaneling of grand or petit juries.'" Also to the following authorities: Lewis Sutherland on Statutory Construction, vol. 1, sec. 200; City of Topeka v. Gillette, 4 Pac., 800; Dunne v. Kansas City Cable Railway Co., 32 S. W. Rep., 641; State v. Herrmann, 75 Mo., 340; State v. Wofford, 25 S. W. Rep., 851; State v. County Court, 1 S. W. Rep., 307; Smith v. Grayson County, 44 S. W. Rep., 921; Young v. State, 51 Texas Crim. Rep., 365; 102 S. W. Rep., 117; Holley v. State, 14 Texas Crim. App., 505; Cordova v. State, 6 Texas Crim. App., 207; Davis v. State, 2 Texas Crim. App., 425; Orr v. Rhine, 45 Texas, 345; Cox et al. v. State, 8 Texas Crim. App., 254, 286–9; Womack v. Womack, 17 Texas, 1; Graves v. State, 6 Texas Crim. App., 228; Gonzales County v. Hous-

ton, 81 S. W. Rep., 118; Ellis v. Fort Bend County, 74 S. W. Rep., 45; Flewellen v. Fort Bend County, 42 S. W. Rep., 775; Hill County v. Atchinson, 49 S. W. Rep., 141; Coombs v. Block, 32 S. W. Rep., 1139; Glover v. Meinrath, 34 S. W. Rep., 72; McMahon v. Pac. Ex., 34 S. W. Rep., 478; Dallas v. Elec. Co., 83 Texas, 243. After a careful review of these authorities we find many of them not at all bearing pertinently on the question under consideration, and none of them appear to us to be in consonance with the true principle and construction of article under consideration, but to our minds the case of Clark v. Finley, 54 S. W. Rep., 343, and 93 Texas, 171, which case was approved by this court in the case of Gillaspie v. State, 42 Texas Crim. Rep., 351; 60 S. W. Rep., 1134, is decisive of the question under consideration. The court had under consideration in the last cited case the constitutionality of the fee bill, Act of 1897, page 5, limiting the fees and compensation of certain officers in counties of less than 3,000 voters, and providing that the county judges shall designate the number of deputies, etc. Chief Justice Gaines, in delivering the opinion of the court, among other things, says: "A law is not special because it does not apply to all persons or things alike. Indeed, most of our laws apply to some one or more classes of persons or of things and exclude all others. Such are laws as to the rights of infants, married women, corporations, carriers, etc. Indeed, it is perhaps the exception when a statute is found which applies to every person or thing alike. Hence it cannot be that the statute under consideration is special merely because it is made to operate in some counties of the State and not in others. The definition of a general law, as distinguished from a special law, given by the Supreme Court of Pennsylvania in the case of Wheeler v. Philadelphia, 77 Pa. St., 338, and approved by the Supreme Court of Missouri, is perhaps as accurate as any that has been given. State v. Tolle, 71 Mo., 645. The court in the former case say: 'Without entering at large upon the discussion of what is here meant by a local or special law, it is sufficient to say that a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special, and comes within the constitutional prohibition.' The law in question is applicable to every county of the designated class. Now, we do not propose to be led off into any extended discussion as to what is a proper class for the application of a general law. The tendency of the recent decisions upon the subject, as it seems to us, is to drift into refinements that are rather more specious than profitable. It is said in some of the cases that the classification must be reasonable; in others, that it must not be unreasonable or arbitrary, etc. If it is meant by this that the Legislature cannot evade the prohibition of the Constitution as to special laws by making a law applicable to a pretended class, which is, in fact, no class, we concur in the proposition. Such was the law passed upon the case of Com. v. Patton, 88 Pa. St., 258. That statute was made applicable to all counties in which

there was a population of more than 60,000, and an incorporated city with a population exceeding 8,000, 'situate at a distance from the county seat of more than twenty-seven miles by the usually traveled public road.' There was but one city in the State which came within the pretended class. The court held this a covert attempt at special legislation, and that the act was a nullity. * * * To what class or classes of persons or things a statute should apply is, as a general rule, a legislative question. When the intent of the Legislature is clear, the policy of the law is a matter which does not concern the courts. A legislature may reach the conclusion that the compensation of certain officers in certain counties of the State is excessive, while in others it is not more than enough. By the reduction of the fees of office throughout the State they may correct the evil in those in which the compensation is too great, but they would probably inflict a greater evil by making the compensation too small in all the others. In such a case it becomes necessary to make the law applicable to some, and not to all. There must be a classification. That classification may be either by population or by taxable value. One Legislature might do, as the Legislature of Texas did, make the classification by population; another, as was done by the Legislature of Arizona, might make the taxable values of the respective counties the basis of the classification. Shall the courts inquire which is correct? Can they say that the work of an officer is not, in some degree, proportionate to the population of his county? On the other hand, can they say that the more the property of a county, the more the crime? To ask these questions is to make it apparent that they are questions of policy, determinable by the political department of the government, and not questions the determination of which by the Legislature is subject to review by the courts. Therefore, should we adopt the rule that, in order to make an act a general law, the classification adopted should be reasonable, we should still be constrained to hold the statute in question a general law, and valid, under our Constitution; for we cannot say that the classification is unreasonable. It may be, as urged in the argument, that there are counties in the class to which the law is made applicable, the population of which very slightly exceeds that of other counties which are without it, and that it seems unreasonable to make a discrimination upon so slight a difference. To this the answer is, the line must be drawn somewhere, and that a similar difficulty would probably result if the classification were made upon any other basis. Exact equality in such matters, however desirable, is practically unattainable." The jury law of this State provides that same shall apply only to counties having cities aggregating twenty thousand in population according to the census of 1900. This is nothing but a rational classification warranted by the Constitution and is not a local or special law within the contemplation of the constitutional clause under consideration. I hold it is not only a rational and reasonable classification, but that it is in entire consonance and accord with previous legislation on this subject, and the evident

reason of the statute under consideration was the inability to get good, fair and impartial juries in the congested centers of our State under the old system of selecting juries, but whether this was the reason or not, the reason does not address itself to the court but to the legislative mind. Appellant, in his able supplemental argument filed herein, insists that the Clark & Finley case is not in point, because the court there was considering a classification of counties by population under a rule that was easy of ascertainment, determinable by the presidential vote in each four years election; the counties having less than three thousand votes being exempted from the operation of the law, while those above that number fell within the terms of the law. Appellant insists that the decision in the Clark & Finley case discussed the advisability and right of the Legislature to make a classification by population, and the question as to restrictions being imposed that would prevent one county from being exempted or being included in the law is not discussed, but the principles involved are in harmony with the principles contended for by appellant, of the right of a classification by population, but that no restriction can be imposed upon it that would arbitrarily exclude some and include others. I cannot agree with the distinction attempted to be made by appellant between the principle laid down in the Clark & Finley case and the question now under consideration. Under the fee bill all counties were within its provisions that had three thousand voters at the last presidential election. This, in a sense, is an arbitrary rule of measurement, or basis of ascertaining a class laid down by the Legislature of this State, which rule cannot be changed until four years have elapsed and other counties have reached a voting strength sufficient to place them under the fee bill. I apprehend that appellant would not insist that the jury law was unconstitutional from the argument suggested above, if there had been a clause in the law saying that the same should apply to all counties having cities of a population of twenty thousand according to the census of 1900, and each recurring census. This would make it altogether like the fee bill. But we hold that a classification under the fee bill is as arbitrary as a classification under the July law. There has to be some legislative yardstick used, and under the decisions of the Supreme Court of this State and other States, the matter of designating classes for legislation is a duty devolving upon the legislative power and not upon the courts. There is no possible way of designating a county when it comes to classifying it with other counties, unless you classify it by population or by taxable values. There is nothing in the statement of facts, nor in the census of 1900 that indicates there is but one city in Texas with a population of twenty thousand, but the census shows several cities that had a population of twenty thousand. We cannot, furthermore, judicially declare a fact to be true dehors the record before us, and hence we cannot hold that there are cities in Texas now of a population of twenty thousand that did not have said population in 1900. While as citizens we might believe the statement to be correct, yet as judges of this court we have no such in-

formation. We accordingly hold that said law is constitutional, does not repeal the old jury law, except the counties affected thereby, and certainly does accord to appellant due process of the law of the land, and is not violative of section 19 of the Bill of Rights. We furthermore hold that the statute is not violative of section 1, article 14, of the Bill of Rights, which says that all laws must be equal and uniform. This is equal and uniform upon the same class. Many authorities are cited by appellant in his supplemental brief, and as suggested, in his original brief, to support his contention, but we think the Clark and Finley case above is decisive of the question. So believing, we hold the law is constitutional. The decision in the Clark & Finley case was reaffirmed by the Supeme Court in the case of Reed v. Rogan, 94 Texas, 183; 59 S. W. Rep., 255, wherein the court held that the laws of 1897, pp. 186–7, providing that in a certain section of the State the school lands which have been leased shall not be subject to sale during the existence of the lease, is not a local or special law prohibited by Constitution, article 3, paragraphs 56–7; and was cited with approval also in the case of Clarke v. Reeves County, 61 S. W. Rep., 981.

Appellant's second complaint is that the court erred in failing to quash the sheriff's return made upon the special venire. The bill covering this matter occupies forty pages of the record. The court approves same with the following qualification: "That for all jurors whom the sheriff's return showed were summoned, either in person or by leaving summons at residence and who were not present, an attachment was issued and all of said jurors were brought into court and for good cause shown all were excused." With this explanation of the court there is nothing left to be considered concerning the objections of appellant to the summoning of the venire, or the organization of the jury.

The sixth ground of the motion complains the court erred in overruling appellant's motion for a new trial on the ground of misconduct of the jury, as follows:

"1. Because the jury heard and discussed extraneous matters affecting the defendant during their deliberations in reaching a verdict, in that, the fact was stated and discussed by the jury that the defendant had killed other men than the deceased, A. S. Johnson.

"2. Because the jury ignored and discarded the special charges given by the court at the instance of the defendant, and refused to consider them as part of the law, on the ground that it was lawyers' talk and not the law.

"3. Because the jury in affixing defendant's penalty at thirty years were influenced by the purpose of denying the defendant bail pending any appeal of the case." As to the proposition that the jury ignored special charges, we held in the case of Dancy v. State, 41 Texas Crim. Rep., 293; 51 S. W. Rep., 635, that "Jurors should not be permitted to show by their affidavit that they ignored and disregarded the charge of the court in considering the evidence." See on same line Christian v.

State, 21 S. W. Rep., 252, and Weatherford v. State, 31 Texas Crim. Rep., 530; 21 S. W. Rep., 251.

In answer to the proposition that the jury had evidence to the effect that appellant had killed another man or other men, and that this was received by the jury, appellant files the affidavit of Sam F. Davis to the effect that Mason (one of the jurors) told him that the fact was mentioned in the juryroom. The juror Mason took the stand and positively denied making any such statement to Davis, denying that anything of this sort occurred in the juryroom. One juror by the name of Cogburn testified that such a thing was mentioned; that it had no influence on him whatever, but he could not tell who mentioned it. Eight jurors testified positively that no such thing occurred in the juryroom. So we have nine other jurors swearing that no such thing occurred in the juryroom, and we have one swearing that it did. It became an issue of fact for the trial court, and he having decided it adversely to appellant, we are not in an attitude to review his decision on same.

As to the third proposition, one of the jurors stated he would not agree to less than fifteen years, because the defendant could get out on bond if he appealed his case. But one juror swears to this, and he was not able to tell which juror mentioned it; all the other jurors denied that such a thing had occurred. This being the state of the evidence on the matter, we cannot review it. Furthermore, in the case of Jack v. State, 20 Texas Crim. App., 656, we think the proper rule in reference to these matters, was laid down in the following language: "It seems to us it would be a dangerous and exceedingly pernicious practice for the courts to permit the sanctity of the juryroom to be invaded and jurors be interrogated as to the arguments used in their deliberations and the influence of such arguments upon their minds, and the reasons and considerations upon which their verdict was based. There might arise perhaps an extreme case in which such practice would be tolerated, to prevent flagrant wrong and injustice. But this court would not be willing to sanction the procedure, unless it should manifestly appear that the ends of justice imperatively demanded it. If it were permitted to attack and set aside a verdict because of arguments and reasons advanced and urged by jurors, and their deliberations thereon, it would destroy free discussion and interchange of opinions among jurors. It would open the door to a searching inquiry in relation to every act and word which transpired in the juryroom, and would subject each individual juror to be placed upon trial before the court to answer for the soundness and propriety of the opinions expressed by him in the juryroom. There is no warrant in the law for such practice. While by our code it is competent to prove misconduct by the voluntary affidavit of a juror, it is nowhere intimated even that jurors can be brought into court by process and compelled to go upon the witness stand and testify as to arguments used, opinions expressed, and votes given by jurors in the juryroom." I accordingly hold that there was no error in

the court overruling the motion on account of the misconduct of the jury.

The seventh complaint is that the court erred in admitting in evidence the alleged written dying declaration of the deceased of date January 22, 1907, because the predicate therefor was insufficient under the law to warrant its admission in evidence; and said predicate failed to show that deceased was in extremis or conscious of impending death, and failed to show that said statement was voluntarily made. I have carefully read the evidence complained of and must say that I do not agree with appellant, but think the predicate was properly laid. While the evidence does not show that deceased expected to die in a moment, he did say he was going to die, and after making this statement the testimony was written down, in all respects legal as suggested by many decisions of this court. Nor would the fact that there were erasures and mutilations in the paper detailing his statement render the evidence inadmissible. The witness who took same could explain the interlineations, as was done. Nor was there any error in permitting Dayton Moses to read the alleged dying declaration written by Charles M. Meng, and to testify "that the paper contained the substance of the statements made by A. S. Johnson, written by Charles M. Meng." The fact that Meng was present as a witness would not render his testimony the best evidence in relation to the paper written by himself when Moses was there and heard everything deceased said, and the statement was written at the instance of Moses. I do not think there was any error in permitting the witness Moses to testify that he saw deceased Johnson and others in the St. George bar a few moments before the shooting, taking a drink, and that the appearance of said A. S. Johnson at that time was that of a man in good humor. That Mr. Johnson and some three of four other men were with him discussing the Bailey question. The evidence in this record discloses the fact that deceased testified a few moments before the homicide that he was in the barroom adjoining the hotel, and took a drink with appellant and other parties, and walked out of the barroom into the corridor of the hotel, and a few moments thereafter the difficulty occurred, in which deceased lost his life. This certainly renders the testimony germane. It is true appellant says he did not see Johnson in there and did not take any drink with him, but this would not render the testimony inadmissible. The dying statement made to Dr. S. W. Rimmer, and the written statement taken down by Charles M. Meng, and the written statement made on January 24, 1907, were all introduced after a proper predicate was laid; and the fact that questions were asked that did not suggest answers, which questions were answered by deceased, would not render the testimony inadmissible.

The tenth complaint is that the court erred in failing to charge the jury as to the rule of law touching the consideration of dying declarations; and in failing to instruct the jury that before they could consider such dying declarations they must find and believe from the evidence that when the deceased made them, if he did, that he made them vol-

untarily and that he was conscious of impending death at the time. If there had been any issue on this question it would have been proper to so charge, but as I understand the record, the deceased was conscious of impending death when he made the statement; and there was no question about the fact, hence I hold, as above stated, the predicate in each instance was properly laid.

Appellant's twelfth complaint is that the court erred in permitting the State in its cross-examination of the defendant to elicit from him the details of the difficulty occurring between the defendant and Bob Miller, shortly prior to the difficulty with deceased, resulting in the homicide charged; in which defendant had cursed Bob Miller and slapped his face, none of which details of the difficulty between the defendant and said Bob Miller had been drawn out in the examination in chief of the defendant. The only facts elicited from the defendant in the examination were that shortly prior to the homicide defendant had had an altercation with said Bob Miller, who stated to defendant that he would settle with defendant later; that defendant had taken his seat and was apprehensive of Miller's return when Johnson came up and pinioned him; that immediately preceding Johnson's coming to defendant's chair, defendant had seen Miller and Johnson in the hotel lobby talking together and looking at him, and that his apprehensions were increased thereby. The bill presenting this matter in addition to the above shows that appellant a few moments before the difficulty violently abused Miller and slapped his face, calling him every vile name that apparently he could call him before slapping him, and, as stated, a few moments thereafter took a seat. Miller and Johnson were seen by appellant talking, and Johnson went to where appellant was and sat down on the arm of the chair appellant was occupying. Now, as to whether appellant had ground to apprehend that Miller and Johnson were his enemies or not is best illustrated and made apparent by the previous colloquy between appellant and Bob Miller. Suppose Miller had a few moments before the homicide abused appellant without cause, or with cause, and appellant had submitted, walked off, and had taken a seat, and subsequently, as he did, killed Johnson, would not appellant have a right to introduce the previous outrage upon him by Miller to illustrate the motive, animus, intent and purpose that actuated appellant at the time of the homicide. Certainly he would. In the first place it is a part of the res gestæ, or this transaction, and clearly illustrates the motive, animus and intent actuating appellant at the time. This testimony I think was clearly admissible under the following authorities: Blackwell v. State, 29 Texas Crim. App., 194; McKinney v. State, 8 Texas Crim. App., 626; Leeper & Powell v. State, 29 Texas Crim. App., 63; McMahon v. State, 16 Texas Crim. App., 357; McCray v. State, 38 Texas Crim. Rep., 609; 44 S. W. Rep., 170. Where several assaults are committed at the same place, and almost simultaneously in point of time, and of the same manifest purpose, and were so closely connected as to relate and be illustrative of each other, making each res gestæ of the other, then said as-

saults so committed are admissible. We further held that said testimony is admissible and competent upon the question of motive, and was not such extraneous matter as to require the trial court to charge the jury in their consideration of extraneous matter as to the specific purposes for which it is admitted. For further discussion of this question see Hamilton v. State, 41 Texas Crim. Rep., 644; 56 S. W. Rep., 926; Elmore v. State, 110 Ala., 63; People v. Gibbs, 93 N. Y., 470; Crass v. State, 31 Texas Crim. Rep., 312.

Appellant's thirteenth complaint is that the court erred in his charge to the jury in instructing the jury that the instrument or means by which a homicide is committed is to be taken into consideration in showing the intent of the party offending. To support this proposition appellant cites us to the cases of Burnett v. State, 46 Texas Crim. Rep., 116; 79 S. W. Rep., 550; Camps v. State, 50 Texas Crim. Rep., 102; 95 S. W. Rep., 1042; Early v. State, 51 Texas Crim. Rep., 382; 103 S. W. Rep., 874. I do not believe said authorities support appellant's position. Those were cases where there was some issue as to the character of the weapon, but here the weapon was a deadly one, being a pistol. This being true, it could not injure appellant to say if a man shoots another with a deadly weapon the presumption is that he intended to kill him. If there was any evidence indicating that the weapon was not a deadly one, the charge would have been appropriate, but where there is no dispute about the deadly character of the weapon, it certainly could not injure appellant to give the statute.

The fourteenth complaint is that the court erred in giving the following charge to the jury on murder in the second degree:

"Implied malice is that which the law infers from or imputes to certain acts, however suddenly done. Thus, when the fact of an unlawful killing is established, and the facts do not establish express malice beyond a reasonable doubt, nor tend to mitigate, excuse or justify the act, then the law implies malice, and the murder is in the second degree; and the law does not further define murder in the second degree, than if the killing is shown to be unlawful, and there is nothing in evidence on the one hand showing express malice, and on the other hand there is nothing in evidence that will reduce the killing below the grade of murder, then the law implies malice, and the homicide is murder in the second degree." In the case of Swain v. State, 48 Texas Crim. Rep., 98; 86 S. W. Rep., 335, cited by appellant, we stated that in the charge on murder in the second degree the court failed to inform the jury in regard to what was meant by "mitigate, excuse or justify the act." In the case before us the court charged on manslaughter, and even conceding that it is necessary to define these terms, we do not think it was necessary in this case. I see nothing amiss in the charge of the court complained of.

I have carefully reviewed all of appellant's special charges on self-defense, and as far as same were applicable to the facts of this case, we think they were aptly covered by the court's main charge, which is quite full and voluminous on the law of self-defense, covering, as we

conceive, every possible phase of self-defense as presented by the evidence. The charge also covers every possible phase of manslaughter presented by the evidence.

Appellant further complains that the court erred in not charging the jury to disregard that part of the closing argument of Judge Clint in which he said, in substance, "If Brown shot because he was being choked, then why didn't they prove by Dr. Baird and other witnesses that he told them that night at his home after the shooting, that Johnson had choked him as he testified on the witness stand." "You are instructed that under the law the defendant would not have been allowed to prove that he told Dr Baird and others that Johnson had choked him, even if he had so told them, and you are instructed that this argument by Judge Clint was improper and should not have been made, and you cannot consider said argument against this defendant for any purpose whatever." The court did not err in failing to give this charge. While counsel had misstated the law, and as appellant insists he could not prove by Dr. Baird what he told him about the party choking him, but an inaccurate argument based upon the evidence is not the basis for a charge. Counsel could answer this argument, and it was not error to refuse a charge on it. Nor did the court err in failing to charge the jury to disregard Judge Clint's argument to the effect that W. O. Brown would not sell to consumers. The court properly charged the jury to disregard the argument. Nor was it improper argument to tell the jury, counsel believed they would convict the defendant because they were honest men. Nor was it improper for Judge Clint to allude to the fact that the law says all parties convicted of a felony are entitled to bail if the punishment is not exceeding fifteen years in the penitentiary.

I note in the main charge of the court that he instructs the jury to disregard that part of Dayton Moses' testimony as to the appearance and manner of deceased in the St. George saloon just prior to the shooting. That is, that at said time deceased was laughing and joking with a party of friends and apparently in a good humor. This certainly cures any error in the matter complained of. Furthermore, the court in the main charge charged the jury as follows: "The fact (if it is a fact) that the defendant Brown was in the wrong in striking Miller, as that difficulty is before you in the evidence, cannot be considered by you in passing upon whether or not the defendant was the aggressor in the subsequent transaction with the deceased Johnson resulting in the death of said Johnson." This charge was certainly helpful to appellant and eliminated any possible chance of appellant being convicted for killing Johnson because he had abused Miller. Under a long line of authorities of this court it was not necessary for the court to permit the circumstances of the previous difficulty to be introduced on the ground, as stated, to show motive, animus, intent and res gestæ, and it was not error not to limit same in his charge to said purposes.

This is one of the most voluminous records that has ever come to this

court. I have reviewed seriatim every suggestion made by appellant. I have written on all that I deem necessary to write upon. I would suggest that hereafter in preparing bills of exception that only the exact point be made by the bill and not all the evidence in the record touching the matter be incorporated in the bill, but simply the substance of the point relied upon. I have carefully reviewed all the evidence in this case, and must say that in my opinion the verdict was warranted by the evidence, and finding no error in the record authorizing a reversal, the judgment should be in all things affirmed.